**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 26-cv-3321

NATHAN JAMES MAY,

     Plaintiff,

v.

CITY OF FORT COLLINS, a municipality,
OFFICER TREVOR CACCIATORE, in his individual capacity, and
OFFICER VINCE HOOLEY, in his individual capacity,

     Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Nathan James May, by and through his attorneys Sarah Schielke of The Life & Liberty Law Office and Matthew Haltzman of Haltzman Law, P.C., respectfully alleges for his *Complaint and Jury Demand* as follows:

**INTRODUCTION**

1. Plaintiff brings this civil rights action pursuant to § 13-21-131, C.R.S. and 42 U.S.C. §§ 1983 and 1988 for various forms of relief, to include compensatory damages and attorney's fees, stemming from Defendants' violations of Plaintiff's rights guaranteed by the Fourth and Fourteenth Amendments to the Constitution of the United States and Article II, Sections 7 and 25 of the Colorado Constitution, to be free from unreasonable seizure, wrongful arrest, and malicious prosecution.

2.  In the early morning hours of July 16, 2025, Nathan May, a 20-year-old student at Colorado State University with no criminal record, no history of drug use, and not a drop of alcohol or any impairing drug in his system, was driving home from a late showing of the new Superman movie. Mr. May does not drink. He has never used an illegal drug in his life.

3.  Two Fort Collins police officers – Defendants Trevor Cacciatore and Vince Hooley – pulled Mr. May over because his headlights had briefly not been activated. What should have been a short fix-your-lights encounter instead became an hour-long ordeal that ended with Mr. May handcuffed, arrested, and booked into the Larimer County Jail for a crime he did not commit and could not have committed: driving under the influence of drugs.

4.  From the outset, every objective indicator confirmed Mr. May's sobriety. He was calm, polite, and fully coherent. His balance was normal. His driving was normal. His speech was normal. He carried on an easy, friendly conversation with one of the cover officers about the movie he had just seen and the route he had taken home. He volunteered to perform roadside maneuvers. He performed them without indication of impairment. He blew a 0.000 on the portable breath test. He told the officers, truthfully and repeatedly, that he had consumed no alcohol and used no drugs.

5.  None of it mattered. Defendants Cacciatore and Hooley had already decided that they were going to claim Mr. May was "on" some unidentified drug.

6.  After his arrest, Mr. May – with remarkable composure for a 20-year-old being wrongly arrested in the middle of the night – told them that he had "blew zeros," that they had "no proof" of impairment, that if they forced him to do a blood test, it would be negative for everything, and that if they went that route, he would be taking legal action against them. He was right on every count.

7. After arresting him, the Defendant officers then searched Mr. May's car. They found no drugs, no paraphernalia, and no alcohol – only a water bottle, which, to no one's surprise, contained water. They then took him to the hospital for a warrantless blood draw, then to jail, where he spent roughly eight hours in custody, unable to even reach his mother to try and post his bond.

8. Months later, the Colorado Bureau of Investigation reported the results of Mr. May's blood draw: no alcohol, and no drugs of any kind, detected, confirming again all that Mr. May had told the officers from the very beginning.

9. On October 16, 2025, the Eighth Judicial District Attorney's Office moved to dismiss all charges against Mr. May, conceding there was "no reasonable likelihood of success at trial." The court dismissed the case on October 29, 2025.

10. But the dismissal did not undo the damage. Because of this baseless arrest, Mr. May was placed on pretrial supervision and subjected to months of humiliating, repeated urine testing – with every result clean. FCPS reported his DUI charge to his school (Colorado State University) and as a result he was placed under a lengthy student-conduct investigation that threatened his academic future. He was forced to cancel a long-planned family trip to Costa Rica. He developed post-traumatic stress disorder, for which he remains in therapy.

11. None of this had to happen. And it would not have happened but for the City of Fort Collins. Long before the night Defendants Cacciatore and Hooley arrested Mr. May, the City of Fort Collins and its Police Services were on notice – through their own (now fired) prolific "DUI Officer" Jason Haferman, an internal-affairs investigation, suppression rulings, civil litigation, and extensive public reporting – that FCPS officers were repeatedly arresting sober, innocent people for DUI without probable cause, mischaracterizing innocent behavior as evidence of impairment, muting their body-worn cameras throughout, and falsifying their reports. Rather

than fix the problem through training, supervision, and discipline, the City has defended and even endorsed the practice. Its officers' wrongful arrest of Mr. May – featuring the very same hallmarks – was the predictable result.

12. Mr. May brings this action to hold Defendants accountable, to obtain redress for the substantial harms he has suffered, and to compel the reforms necessary to ensure that what was done to him is not done to the next innocent driver who forgets to turn on his headlights for a few blocks in Fort Collins.

## JURISDICTION AND VENUE

13. This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and 42 U.S.C. § 1983.

14. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

15. This Court has supplemental jurisdiction over Plaintiff's claims arising under Colorado law, including his claims under § 13-21-131, C.R.S., pursuant to 28 U.S.C. § 1367, because those claims are so related to the federal claims that they form part of the same case or controversy.

16. This Court has authority to grant the declaratory relief requested herein pursuant to 28 U.S.C. § 2201.

17. Jurisdiction supporting Plaintiff's claim for attorney's fees and costs is conferred by 42 U.S.C. § 1988 and § 13-21-131(3), C.R.S.

18. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all parties reside within the State of Colorado.

## PARTIES

19. Plaintiff Nathan James May is a citizen of the United States and was at all times relevant hereto a resident of and domiciled in the State of Colorado. He resides in Fort Collins, Larimer County, Colorado, where he is a student at Colorado State University ("CSU").

20. Defendant Trevor Cacciatore was at all times relevant to this Complaint a duly appointed and sworn police officer employed by Fort Collins Police Services. At all times relevant hereto, Defendant Cacciatore was acting under color of state law. Defendant Cacciatore is a named Defendant in his individual capacity.

21. Defendant Vince Hooley was at all times relevant to this Complaint a duly appointed and sworn police officer employed by Fort Collins Police Services. At all times relevant hereto, Defendant Hooley was acting under color of state law. Defendant Hooley is a named Defendant in his individual capacity.

22. Defendant City of Fort Collins is a governmental entity and municipality incorporated under the laws of the State of Colorado, subject to suit under 42 U.S.C. § 1983. Fort Collins Police Services ("FCPS") is a department of the City of Fort Collins. The City of Fort Collins enforces local and state law through its law enforcement agency, FCPS.

23. At all times relevant to this Complaint, Defendant City of Fort Collins employed and was responsible for the promulgation of the policies, customs, practices, and training of FCPS personnel, including Defendants Cacciatore and Hooley, and was responsible for their oversight, supervision, and discipline. Defendant City of Fort Collins was the body responsible for FCPS's official policies and practices, as well as FCPS's unofficial customs and practices, with respect to DUI arrests and probable cause.

## STATEMENT OF FACTS

### *The Stop*

24. On July 16, 2025, at approximately 2:00 a.m., Plaintiff Nathan May was driving his silver 2010 Toyota RAV4 home after seeing a late-night showing of the new Superman movie at a theater near Timberline Road in Fort Collins.

25. Mr. May, then 20 years old, was a student at CSU with no criminal history and a clean driving record – no prior convictions, suspensions, or accidents. He had not consumed any alcohol or drugs. He does not drink alcohol, and he has never used illegal drugs.

26. Defendant Fort Collins Police Officers Cacciatore and Hooley were on patrol near the intersection of East Horsetooth Road and South College Avenue (an area that is very well-illuminated at night by virtue of countless activated street lights and lighted street signs) when they observed Mr. May's vehicle was stopped at a red light without its headlights illuminated.

27. The officers pulled to the side of the road and waited for Mr. May to pass, then pulled in behind him. As they did so, they saw Mr. May turn on his headlights. Near the intersection of South College Avenue and Boardwalk Drive, Defendant Hooley still decided to activate his emergency lights to initiate a traffic stop.

28. Mr. May promptly, safely, and soberly turned left onto Boardwalk Drive and pulled into the parking lot of the First National Bank, where he parked. This driving conduct that Defendant Cacciatore would later characterize in his report as "erratic" – slow-rolling, brief acceleration, and turns without signaling – occurred entirely after Defendant Hooley had activated his emergency lights – that is, while Mr. May was complying with the stop and navigating to a safe and well-lit place to park. Mr. May's driving while navigating to a safe and well-lit parking spot in this lot was normal and without indication of impairment to even the slightest degree.

29. Defendants' body-worn cameras recorded most of the encounter. Those recordings are incorporated by reference into this Complaint and will be conventionally submitted as exhibits.[1]

### *The Encounter and Field Sobriety Tests*

30. Defendant Hooley approached the driver's window, told Mr. May he had been stopped for driving without headlights, and asked for his license, registration, and insurance. Mr. May was cooperative and polite. He promptly produced his license and told Hooley he had just come from seeing the Superman movie.

31. After less than one minute of interaction, Defendant Hooley claims to have concluded – as Defendant Cacciatore's report would later put it – that Mr. May "appeared to be under the influence of drugs or alcohol," and Defendant Cacciatore took over the investigation.

32. Mr. May consistently (and, quite truthfully) denied using any drugs or alcohol. Asked to explain his driving, he expressed some skepticism about there being anything wrong with his driving but, wanting to remain respectful to the officers, he offered that any issues they claimed to have observed with his driving could be the result of him being tired, since it was past 2:00 a.m. and he had been awake since about 9:00 a.m. the previous morning.

33. Believing that roadside tests would be administered fairly and correctly by the officers and would thus prove his innocence, and believing that his cooperation with these tests would promptly dispel any of the officers' claimed DUI suspicions, Mr. May offered to perform

---

[1] Defendant Cacciatore's BWC video is conventionally submitted as **Exhibit 1**, and Defendant Hooley's BWC video is conventionally submitted as **Exhibit 2**. Both videos are also available online via this link:
https://www.dropbox.com/scl/fo/6duyikxnwph802bcjvffr/AH4G9_Oz_vauGcK3A-aKZk8?rlkey=8eyvw6rv3g8kb6fk54220bt9p&st=qazjeai5&dl=0

roadside maneuvers. Defendant Cacciatore then began attempting to administer the Standardized Field Sobriety Tests ("SFSTs") to Mr. May.

34. At one point during the roadside detention, Mr. May spoke with a cover officer in a relaxed and entirely coherent conversation – discussing the Superman movie, recommending it, and explaining in detail the route he had taken from the theater toward his home. Nothing about Mr. May's speech, memory, comprehension, or demeanor suggested impairment of any kind.

35. Mr. May disclosed that he was prescribed Prozac (fluoxetine), a prescription antidepressant, but that he took it at night before going to sleep and that he had thus not taken it at all that day.

36. Not that it matters (since Mr. May had not taken his Prozac in over 24 hours), but an antidepressant like Prozac is not an impairing substance that affects driving. The Centers for Disease Control and Prevention estimates that 13.2% of American adults take an antidepressant.

37. Defendant Cacciatore's report materially mischaracterized and exaggerated Mr. May's performance on the SFSTs, while omitting the context and the many indicators of sobriety apparent on the body-worn camera recordings.

38. Defendant Cacciatore administered the SFSTs incorrectly to Mr. May. Despite Cacciatore administering and instructing the SFSTs incorrectly, Mr. May nevertheless displayed no indicia of impairment and continued to display countless indications of sobriety and non-impairment.

39. Mr. May, growing increasingly concerned about Cacciatore's competency to administer roadsides and by how long it was taking Cacciatore to attempt to administer the tests (while continuing to feel increasingly more tired with the late hour) asked Cacciatore how many more tests the officers needed him to do ("How many more of these would you like to do?") and

whether he could head home ("Do you mind if I just head home? I have somewhere to be early in the morning"). Defendant Cacciatore later recast this reasonable question and request to end an invasive, extended detention in his report as a "refusal," falsely stating that Mr. May "refused to continue the road sides" and "declined to participate in the finger to nose maneuver," when in truth Mr. May had completed every maneuver Cacciatore had actually purported to administer and Cacciatore had never even offered the finger to nose maneuver.

40. Defendant Cacciatore also attempted in his report to characterize ordinary behaviors of Mr. May, like breaking eye contact, taking "deep swallows," "clinch[ing] his fingers," and even "curl[ing] the corners of his lips" as evidence of deception and drug use. These are normal (and foreseeable) human reactions to being accused of a crime they did not commit and they have no scientifically validated correlation to drug use or deception.

41. Defendant Cacciatore also falsely characterized Mr. May's speech in his report as "slow" and "slurred" speech. This claim is observably false and belied by the video. Mr. May had normal speech throughout the encounter.

42. Defendant Cacciatore also falsely characterized Mr. May in his report as "display[ing] the inability to pay attention to directions." Despite the very late hour and his fatigue, Mr. May can nevertheless be seen on video paying perfect attention to the directions given by Cacciatore.

### *The Arrest – Despite a 0.000 Breath Test and No Evidence*

43. Defendants Cacciatore and Hooley muted their body-worn camera microphones for approximately five minutes while they conferred out of Mr. May's earshot and while Cacciatore retrieved (and struggled to operate) a portable breath test device.

44. Defendant Cacciatore then administered a portable breath test ("PBT") to Mr. May. The result was 0.000 – no alcohol whatsoever – exactly as Mr. May had said.

45. Moments after the 0.000 result, as Cacciatore walked back toward the patrol car, Defendant Hooley asked him: "Want me to go on mute again?"

46. With alcohol excluded and not a shred of evidence of any drug, the officers conferred. Neither officer could name a drug, identify an impairing substance, or point to any objective evidence of impairment, because there was none.

47. Defendant Hooley nonetheless then placed Mr. May under arrest for Driving Under the Influence of Drugs ("DUID"), C.R.S. § 42-4-1301(1)(a). Neither Defendant officer had probable cause to believe Mr. May was impaired by any substance.

48. The officers then searched Mr. May's vehicle – a warrantless search Defendant Hooley had volunteered to perform "just for the rep." They found no drugs, no paraphernalia, and no alcohol. They even opened and checked his water bottle. "It's water."

49. Throughout all this, Mr. May calmly and accurately asserted his innocence. He told the officers he "blew zeros," that they had no "proof" or "probable cause" to arrest him, that the blood test would come back clean, and that he would pursue legal action.

### *The Blood Draw, Booking, and Eight Hours in Jail*

50. Defendant Cacciatore read Mr. May the Colorado Express Consent advisement. When Mr. May initially declined the blood test, Cacciatore advised him that refusal would subject his driver's license to revocation and that his refusal could be used against him as evidence at trial. Having no choice, Mr. May agreed to the invasive blood draw. He was transported to Poudre Valley Hospital, where a blood sample was drawn from his right arm at approximately 3:06 a.m.

51. During the blood draw, Mr. May observed aloud that Defendant Cacciatore had never identified himself by name or badge number at any point during the encounter. Rather than acknowledge this, Cacciatore mocked the handcuffed 20-year-old, responding, "I'm sorry, what law is that?" and "Which CRS statute so I can refer to that?" and "Look it up."

52. Mr. May was then transported to the Larimer County Jail and booked on the DUI charge. He remained in custody for approximately eight hours before being able to post bond.

*The Blood Results, FCPS's Demand for More Testing, and the Dismissal*

53. Months later, on September 9, 2025, the Colorado Bureau of Investigation issued its laboratory report. Mr. May's blood contained no ethanol or volatiles and no drugs of abuse. Nothing impairing (indeed, nothing at all) was detected. The results confirmed what Mr. May had expressly told (and which all observations of him had similarly communicated to) the officers from the start.

54. Rather than accept that the arrest had been baseless, Defendant Cacciatore reported to his supervisor that, "based on the observations he made during the arrest," a "more in depth drug screening was necessary," and he requested additional testing be done on Mr. May's blood. Cacciatore reported that he had already consulted FCPS's current "DUI officer" about Mr. May's clean blood results, revealing that FCPS still staffs a dedicated DUI-arrest officer position.

55. This request was made pursuant to FCPS's actual policy of treating all "none detected" blood results not as evidence of a driver's innocence, but as indication of some deficiency with the laboratory or scope of testing.

56. On October 16, 2025, the Eighth Judicial District Attorney moved to dismiss all charges against Mr. May, stating that "the People have no reasonable likelihood of success at trial."

The court granted the motion and dismissed the case on October 29, 2025. The prosecution

thus terminated in Mr. May's favor.

### DAMAGES TO NATHAN MAY

57. As a direct and proximate result of his wrongful arrest, Mr. May suffered, and continues to

suffer, extensive damages across every dimension of his life.

58. Following his arrest, Mr. May was subjected to pretrial supervision by Larimer County Pretrial

Services as a condition of his bond. This supervision included regular urinalysis drug testing,

which Mr. May was required to pay for out of pocket at significant personal expense. Every

single test came back clean, consistent with Mr. May's truthful and consistent statements that

he does not use drugs or alcohol.

59. The urinalysis testing process was deeply humiliating to Mr. May. He suffers from a

recognized anxiety-based condition commonly known as "shy bladder" (paruresis), which

makes it difficult or impossible to provide a urine sample under observation. The pretrial

regime required observed urinalysis, which was extraordinarily distressing, and Mr. May was

required to provide a urine sample on approximately twenty occasions.

60. In order to switch from urinalysis testing to breath testing, Mr. May was required to obtain a

letter from his physician documenting his condition. Having to explain to his doctor that he

needed such a letter because he had been arrested for a DUI he did not commit was humiliating

and degrading. After his physician provided the letter, a hearing was held before the Court,

which allowed Mr. May to switch to breath testing. The entire process was an unnecessary

ordeal caused entirely by Defendants' wrongful arrest.

61. As a further consequence of being placed on pretrial supervision, Mr. May was forced to cancel

a long-planned family trip to Costa Rica.

62. The out-of-pocket costs associated with pretrial services, including testing fees, were a significant financial burden on Mr. May, a college student with limited financial resources.

63. In addition, as a result of the arrest, Mr. May was reported to Colorado State University, which initiated a student-conduct investigation into him. The threat of academic discipline, suspension, or expulsion from CSU as a result of a DUI arrest for a crime he did not commit caused Mr. May extreme anxiety, fear, and distress, and hung over his academic life, affecting his ability to concentrate on his studies and plan for his future.

64. As a direct result of this wrongful arrest and its aftermath, Mr. May has been diagnosed with Post-Traumatic Stress Disorder ("PTSD") and has been receiving ongoing therapy to address the trauma, anxiety, hypervigilance, and emotional distress caused by Defendants' actions. Among other ongoing symptoms, Mr. May suffered an acute anxiety episode upon encountering one of the arresting officers in a store months after the arrest, and believed that the officer then followed him – compounding his fear and sense of lost security.

65. Mr. May – a young man who has never used illegal drugs and does not consume alcohol – was forced to endure months of being treated as a criminal, subjected to invasive testing, reported to his university, investigated by student-conduct authorities, and made to live under the constant shadow of criminal prosecution and potential academic expulsion, all because two Fort Collins police officers arrested him without probable cause based on a fabricated and incompetent investigation.

66. Mr. May has incurred, and continues to incur, expenses related to this wrongful arrest, including but not limited to attorney's fees for criminal defense, pretrial testing costs, and medical and therapy costs.

67. Mr. May's life was upended by this arrest. The experience has caused him to lose trust in law enforcement, to live in fear of future encounters with police, and to suffer ongoing psychological harm that has fundamentally altered his sense of safety and well-being.

**FORT COLLINS'S PATTERN AND PRACTICE OF WRONGFUL DUI ARRESTS AND FAILURE TO TRAIN AND SUPERVISE**

68. The wrongful arrest of Mr. May was not an aberration. It was the foreseeable product of a longstanding FCPS pattern and practice of arresting sober, innocent drivers for DUI without probable cause, and of the City of Fort Collins's deliberate failure to train, supervise, and discipline its officers with respect to DUI investigations and probable cause – a failure of which the City had abundant notice well before July 16, 2025.

69. Like many Colorado law enforcement agencies, FCPS has strong institutional incentives to maximize the quantity of DUI arrests its officers make. State and federal grant funding for DUI enforcement is allocated in a manner that rewards agencies for higher DUI arrest numbers, and organizations award recognition and favorable publicity to agencies and officers who make abundant DUI arrests. These incentives reward the quantity of DUI arrests over their validity.

70. Acting on those incentives, FCPS created and staffed a dedicated "DUI Officer" position, the purpose of which was to seek out and charge as many drivers as possible with DUI offenses. FCPS filled that role with its most prolific DUI-arresting officer, Jason Haferman.

71. Beginning no later than 2020 and 2021, Officer Haferman engaged in a documented pattern of stopping and arresting drivers for DUI without reasonable suspicion or probable cause. He routinely claimed to interpret normal human behaviors as "clues" of impairment, administered roadside maneuvers improperly, wrote reports containing falsehoods and exaggerations, and repeatedly muted or deactivated his body-worn camera in violation of FCPS policy and

Colorado law. Many of his DUI arrests resulted in blood tests showing no impairing substance detected.

72. The City of Fort Collins had notice of this misconduct. Among other things, a Larimer County court suppressed the evidence in one of Officer Haferman's stops, ruling his detention "unquestionably unconstitutional" and openly questioning the veracity of his testimony. FCPS's own supervisors were aware that Haferman was counting non-clues as evidence of impairment, yet failed to meaningfully review his work, audit his many "none detected" DUI cases, or correct the practice.

73. FCPS ultimately opened an internal-affairs investigation into Officer Haferman's wrongful DUI arrests in response to all the public scrutiny and media attention. In that investigation, Haferman admitted that no one at FCPS had supervised his DUI work, and that he had never been told he was doing anything wrong because no supervisor had ever reviewed it. Multiple FCPS officers acknowledged that Haferman's incorrect administration of the roadside maneuvers was obvious on his videos. Officer Haferman's tenure as FCPS's DUI Officer ended, and his wrongful DUI arrests became the subject of extensive public reporting and civil litigation against the City.

74. Just recently, the City of Fort Collins paid what is believed to be a record-breaking $500,000 to settle one of the wrongful DUI arrest lawsuits filed against it back in 2023 – *Cunningham v. City of Fort Collins, et al.*, 23-cv-01342-CNS-SBP.

75. Also recently, the City of Fort Collins paid $150,000 to settle another of the wrongful DUI arrest lawsuits filed against it back in 2023 – *Erbacher v. City of Fort Collins, et al.*, 23-cv-01341-CNS-NRN.

76. There are currently two other wrongful DUI arrest civil rights lawsuits still pending against the City of Fort Collins: *Elias v. City of Fort Collins, et al.*, 23-cv-01343-GPG-KAS, and *Sever v. City of Fort Collins, et al.*, 23-cv-01344-NYW-NRN.

77. All of these lawsuits had been long pending against the City at the time it and its officers inflicted these civil rights violations upon Mr. May when they wrongfully arrested him for DUI.

78. Just recently, a federal judge denied the City's motion for summary judgment in one of the long- (and still-) pending wrongful DUI arrest civil rights lawsuits against the City (specifically, the *Elias* case), ruling that a reasonable jury could find that the Defendant FCPS officer *and* the City had violated Plaintiff Elias's civil rights when it wrongfully arrested him for DUI, and permitting the matter to proceed to trial.

79. Rather than take accountability in the *Elias* case, the City apparently decided to incur significantly more expense and have former officer Haferman attempt to take interlocutory appeal of the federal judge's decision to the 10th Circuit Court of Appeals. Mr. Elias filed a motion to have that appeal certified as frivolous. That motion remains pending.

80. Rather than respond to all this abundant notice by reforming its training and supervision with respect to DUI arrests, the City of Fort Collins has instead publicly defended all the wrongful DUI arrests at issue in the prior lawsuits (including the two they just recently settled for significant sums) – by suggesting, through its policymakers (primarily Chief Jeffrey Swoboda), that drivers whose blood comes back with no impairing substances detected are nonetheless impaired by some substance the laboratory simply could not detect. This is the same rationalization Defendant Cacciatore invoked when he requested additional testing of Mr. May's blood.

81. Despite the prolific litigation it has already been exposed to (and had to compensate prior victims for) related to the City's failures to train and supervise its officers in DUI investigations, the problems clearly have not been corrected. As a result, the same constitutional violations recurred with Mr. May. Defendants Cacciatore and Hooley – ordinary patrol officers, not even assigned to DUI enforcement – replicated the very hallmarks of the misconduct the City had long known about: arresting a sober driver who blew 0.000 and whose blood was clean; recharacterizing innocent behavior (fatigue, nervousness, eyelid tremors, swallowing, etc.) as drug impairment; muting their body-worn microphones; and falsifying and exaggerating their reports.

82. The City of Fort Collins's unconstitutional customs and practices with respect to DUI arrests, and its deliberately indifferent failure to train, supervise, and discipline its officers despite actual notice of a pattern of wrongful DUI arrests, were a moving force behind and a proximate cause of the violation of Mr. May's constitutional rights.

### FIRST CLAIM FOR RELIEF
Section 13-21-131, C.R.S. – Seizure/Arrest Without Probable Cause
Violation of Colorado Constitution, Article II, Section 7
(against Defendants Cacciatore and Hooley)

83. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

84. Section 13-21-131 of the Colorado Revised Statutes directs that any peace officer who "subjects or causes to be subjected, including failure to intervene, any other person to the deprivation of any individual rights … secured by the bill of rights, article II of the state constitution" is liable to the injured party for legal or equitable relief or any other appropriate relief.

85. Statutory immunities and statutory limitations on liability, damages, or attorney fees do not apply to claims brought pursuant to § 13-21-131.

86. Defendants Cacciatore and Hooley were peace officers under Colo. Rev. Stat. § 24-31-901(3), employed by the City of Fort Collins and FCPS, at the time they wrongfully seized, arrested, and maliciously prosecuted Mr. May.

87. Neither Defendant at any time during the encounter had probable cause, reasonable suspicion, or any other legally valid basis to believe that Mr. May had committed, was committing, or was about to commit the offense of DUID or any other crime warranting arrest.

88. Defendants did not at any time have a warrant authorizing the seizure or arrest of Mr. May.

89. Defendants unreasonably seized and arrested Mr. May in violation of his rights under Article II, Section 7 of the Colorado Constitution, in a manner that was objectively unreasonable in light of the facts and circumstances confronting them before, during, and after the encounter.

90. Defendants knowingly violated Mr. May's individual rights secured by the bill of rights of the Colorado Constitution, and did not act upon a good-faith and reasonable belief that their actions were lawful.

91. The acts or omissions of Defendants were the moving force behind, and the proximate cause of, the injuries sustained by Mr. May.

92. Defendants' wrongful arrest and humiliation of Mr. May caused him to experience extraordinary stress, expense, fear, anxiety, depression, and trauma, including a diagnosis of PTSD, loss of any feeling of safety or security, academic jeopardy, and the other damages and injuries described herein.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Unlawful Arrest Without Probable Cause
### Violation of the Fourth Amendment
(against Defendants Cacciatore and Hooley)

93. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

94. The actions of Defendants Cacciatore and Hooley, while acting under color of state law, intentionally deprived Mr. May of the rights, privileges, liberties, and immunities secured by the Constitution of the United States, including his right to be free from unreasonable seizure as guaranteed by the Fourth Amendment, in that Mr. May was arrested without a warrant and without probable cause to believe he had committed any offense.

95. Defendants Cacciatore and Hooley knew that Mr. May was unimpaired and that they had no probable cause to arrest him, and they did so anyway, with deliberate indifference to his rights under the Fourth Amendment.

96. Defendants' arrest of Mr. May was objectively unreasonable in light of the facts and circumstances confronting them before, during, and after the encounter, including the 0.000 PBT result, Mr. May's coherent demeanor and consistent denials, his completion of the roadside maneuvers, and the absence of any drug, paraphernalia, or other evidence of impairment.

97. Defendants' conduct was attended by circumstances of malice, or willful and wanton conduct, which they must have realized was dangerous, or that was done heedlessly and recklessly, without regard to the consequences or to Mr. May's rights.

98. Defendants' unlawful arrest of Mr. May was the moving force behind, and the proximate cause of, the damages described herein.

THIRD CLAIM FOR RELIEF

Section 13-21-131, C.R.S. – Violation of Due Process / Malicious Prosecution
Violation of Colorado Constitution, Article II, Section 25
(against Defendants Cacciatore and Hooley)

99. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

100. Section 25 of Article II of the Colorado Constitution guarantees Mr. May the right not to be deprived of life, liberty, or property without due process of law.

101. Defendant Cacciatore caused the criminal prosecution of Mr. May by falsifying and deliberately exaggerating the facts in his report regarding impairment, and by materially omitting the numerous indications of Mr. May's sobriety, in an effort to make it appear there had been probable cause for the arrest, and by providing those documents to the Eighth Judicial District Attorney.

102. Defendants also caused Officer Benjamin Melusky to swear out, before a notary, an Affidavit in Support of Warrantless Arrest that repeated Defendant Cacciatore's false and misleading account verbatim – including its false claim that Mr. May had "declined to participate in the finger to nose maneuver" – and to submit that sworn affidavit to the Larimer County Court for its probable cause determination.

103. Defendant Hooley caused and continued the criminal prosecution of Mr. May by effecting the wrongful arrest and by failing to intervene to prevent the arrest and prosecution of a person he knew or should have known was not impaired.

104. Defendants' false allegations and omissions were the moving force behind the criminal prosecution of Mr. May. No probable cause supported the charges Defendants brought against him.

105.    The criminal prosecution terminated in Mr. May's favor when the Eighth Judicial District

Attorney dismissed all charges. Defendants acted with malice and in disregard of Mr. May's

state constitutional rights, causing him the damages described herein.

<u>FOURTH CLAIM FOR RELIEF</u>
Section 13-21-131, C.R.S. – Unlawful Seizure/Detention, Unlawful Searches
(detention after 0.000 breath test; warrantless searches of vehicle and blood)
Violation of Colorado Constitution, Article II, Sections 7 and 25
(against Defendants Cacciatore and Hooley)

106.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth

herein.

107.    Defendants Cacciatore and Hooley were peace officers under Colo. Rev. Stat. § 24-31-

901(3), employed by the City of Fort Collins and FCPS, at all times relevant hereto.

108.    After Mr. May submitted to a portable breath test that produced a result of 0.000 – and with

no evidence of any kind that he had consumed any impairing substance – Defendants

Cacciatore and Hooley went from knowing they did not have probable cause to arrest Mr. May

to knowing that they were continuing the unlawful seizure of an in fact proven-to-be-innocent

individual.

109.    Defendants nevertheless continued their unlawful seizure of Mr. May's person, searched

his lawfully parked vehicle without a warrant, probable cause, exigency, or any other exception

to the warrant requirement, and forced Mr. May to submit to an invasive and unlawful search

of his blood.

110.    Defendants thereby knowingly violated Mr. May's individual rights secured by Article II,

Section 7 of the Colorado Constitution, and did not act upon a good-faith and reasonable belief

that their actions were lawful.

111.    Defendants' actions as described in this section were done with malice and caused Plaintiff

damages.

FIFTH CLAIM FOR RELIEF
42 U.S.C. § 1983 – Malicious Prosecution
Violation of the Fourth and Fourteenth Amendments
(against Defendants Cacciatore and Hooley)

112.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth

herein.

113.    Defendants caused Mr. May's seizure, continued confinement, and prosecution by

arresting him without probable cause and by preparing and providing untruthful and

misleading reports to the District Attorney.

114.    Defendants' false allegations, exaggerations, and omissions were the moving force behind

the criminal prosecution of Mr. May. No probable cause supported his arrest, continued

confinement, or prosecution, a fact plainly known to Defendants.

115.    The criminal prosecution terminated in Mr. May's favor when all charges were dismissed.

Defendants acted with malice and with deliberate indifference to Mr. May's rights under the

Fourth and Fourteenth Amendments, causing him the damages described herein.

SIXTH CLAIM FOR RELIEF
42 U.S.C. § 1983 – Municipal Liability (Monell)
Unconstitutional Custom and Practice; Failure to Train and Supervise
Violation of the Fourth and Fourteenth Amendments
(against Defendant City of Fort Collins)

116.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth

herein.

117.    Defendant City of Fort Collins is a municipality subject to liability under 42 U.S.C. § 1983. FCPS is a department of the City, and the City was responsible for the policies, customs, practices, training, supervision, and discipline of FCPS personnel.

118.    At all relevant times, the City of Fort Collins maintained an unconstitutional custom and practice of arresting drivers for DUI offenses without probable cause, including by recharacterizing innocent behavior as evidence of impairment and by treating "none detected" blood results as a deficiency of the laboratory rather than as proof of innocence.

119.    The City of Fort Collins had actual and constructive notice – through, among other things, the documented pattern of wrongful DUI arrests by its former DUI Officer Jason Haferman, judicial suppression rulings, an internal-affairs investigation, civil litigation, and extensive public reporting – that its officers were repeatedly arresting innocent people for DUI without probable cause, mischaracterizing innocent behavior as impairment, administering SFSTs incorrectly and falsifying their reports.

120.    Despite this notice, the City of Fort Collins was deliberately indifferent to the obvious need to train, supervise, and discipline its officers with respect to DUI investigations, the administration and interpretation of field sobriety tests, and probable cause. Rather than correct the practice, the City, through its Chief (who regularly made public statements re: the same) defended it and ratified it (even while paying out substantial sums of money in lawsuit settlements to previous victims of it).

121.    The City's failure to train and supervise was so likely to result in the violation of constitutional rights that its deliberate indifference may be inferred, and its unconstitutional custom and practice was so persistent and widespread as to constitute a custom or usage with the force of law.

122. The City of Fort Collins's unconstitutional custom and practice, and its deliberately indifferent failure to train, supervise, and discipline its officers, were a moving force behind and a proximate cause of the violation of Mr. May's Fourth and Fourteenth Amendment rights and of the damages he sustained.

SEVENTH CLAIM FOR RELIEF
42 U.S.C. § 1983 – Unlawful Searches of Car and Blood
Violation of the Fourth Amendment
(against Defendants Cacciatore and Hooley)

123. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

124. The actions of the Defendant officers as described herein, while acting under color of state law, intentionally deprived Mr. May of the securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including his right to be free from unlawful seizure as guaranteed by the Fourth Amendment to the Constitution of the United States of America and 42 U.S.C. § 1983,  when they obtained proof of his innocence (triple zeroes breath test and no observations/admissions indicating impairment from any other source) and then still (1) searched his vehicle, and (2) forced Mr. May to submit to an invasive and unlawful search of his blood.

125. A blood draw is considered a search (and an invasive one) under the Fourth Amendment.

126. Defendant officers unreasonably searched Mr. May's lawfully parked vehicle without a warrant, probable cause, exigency, or any other exception to the Fourth Amendment's warrant requirement, with deliberate indifference to Mr. May's rights under the Fourth Amendment of the U.S. Constitution.

127.   Defendant officers unreasonably forced Mr. May to submit to an unlawful search of his blood with deliberate indifference to Mr. May's rights under the Fourth Amendment of the U.S. Constitution.

128.   Defendants' actions as described in this section were done with malice and caused Plaintiff damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law and equity, including but not limited to:

a.   Declaratory relief and injunctive relief, as appropriate;

b.   Actual economic damages as established at trial;

c.   Compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, trauma, fear, anxiety, loss of enjoyment of life, loss of liberty, loss of sense of security, and other non-pecuniary losses;

d.   Punitive or exemplary damages for all claims as allowed by law in an amount to be determined at trial;

e.   Issuance of an Order mandating appropriate equitable relief, including but not limited to:

i.   Issuance of a formal written apology from each Defendant to Plaintiff;

ii.   The imposition of appropriate policy changes designed to avoid future similar misconduct by Defendants;

iii.   Mandatory training designed to avoid and prevent future similar misconduct by Defendants; and

    iv. Imposition of appropriate disciplinary action against the responsible employees of

        Fort Collins;

f.  Pre-judgment and post-judgment interest at the highest lawful rate;

g.  Attorney's fees and costs; and

h.  Such further relief as justice requires.

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted this 22nd day of July, 2026.

**THE LIFE & LIBERTY LAW OFFICE**

*/s/ Sarah Schielke*
Sarah Schielke
Co-Counsel for Plaintiff
The Life & Liberty Law Office
1055 Cleveland Avenue
Loveland, CO 80537
P: (970) 493-1980
F: (970) 797-4008
E: sarah@lifeandlibertylaw.com

**HALTZMAN LAW FIRM, P.C.**

*/s/ Matthew Haltzman*
Matthew Haltzman
Co-Counsel for Plaintiff
Haltzman Law Firm P.C.
204 Maple Street, Suite 101
Fort Collins, CO 80521
P: (970) 692-3440
F: (970) 797-2419
E: matthew@haltzmanlaw.com